**OWENS v. CURTISS CANDY CO.**
No. 13672.

Circuit Court of Appeals. Eighth Circuit.
July 20, 1948.

Writ of Certiorari Denied Nov. 22, 1948.
See 69 S.Ct. 168.

Martin J. O'Donnell, of Kansas City, Mo. (Lois Finley Settle and M. A. O'Don-

nell, both of Kansas City, Mo., on the brief), for appellant.

Charles F. Lamkin, Jr., of Kansas City, Mo., and Edwin F. Zukowski, of Chicago, Ill. (Walker, Atwood, Zukowski & Mc-Farland, of Chicago, Ill., and Warrick, Brewer & Lamkin, of Kansas City, Mo., on the brief), for appellee.

Before GARDNER, WOODROUGH, and COLLET, Circuit Judges.

WOODROUGH, Circuit Judge.

This civil action was brought by Harry (Buck) Owens, an actor and radio broadcaster, here referred to as Owens, against the Curtiss Candy Company, a corporation engaged in manufacturing and selling "Baby Ruth" and other candy bars, here referred to as Curtiss, for damages for breach of an alleged contract of employment. Owens claimed that Curtiss employed him to render personal services as a radio entertainer advertising the Curtiss products for a term of two years from September, 1940, at the rate of $500 per week, and wrongfully discharged him in August 1940, and prevented him from performing any part of the services to his damage in the sum of $153,600 for which he prayed judgment. Curtiss admitted that it had employed Owens in the capacity indicated during the forepart of 1940, first for a test period of thirteen weeks ending June 28, 1940, and thereafter from week to week until all employment was terminated, Owens's services were paid for and the relations ceased in August, 1940. Curtiss denied that it had employed Owens for the two year period for which the damages were claimed. It also set up the statute of frauds of Missouri and Illinois and denied the existence of any contract in writing upon which action for damages for breach of an agreement not to be performed within one year could be maintained under either statute. Mo.R.S.A. §§ 3352–3358; Ill.Rev. Stat. 1947, c. 59, § 1 et seq. It also pleaded that after the dates upon which Owens claimed to have a contract of employment for a two year period Owens waived, re-linquished and abandoned any rights or claims therein and the parties mutually agreed upon termination of the employer and employee relationship. Curtiss further alleged that a decision it arrived at and indicated to Owens in June of 1940, that it would accept a certain proposal for employment then made to it on behalf of Owens, was induced by and arrived at in reliance upon representations made in the letter of proposal concerning the radio station cost of presenting the radio program and the availability of time upon named radio stations, which representations were substantial and material particulars, and as soon as the mistake was discovered by the parties the acceptance of Owens's offer to render the services was withdrawn and the undertakings based thereon were mutually rescinded and cancelled before any performance was entered upon, and Owens acquiesced and waived and abandoned all claim of right under them.

Jurisdiction existed because of diversity and amount in controversy, and the jury trial resulted in a verdict for the defendant Curtiss upon which judgment dismissing the action was entered and Owens appeals.

He contends (1) that he was entitled to recover on the pleadings and the evidence as a matter of law; (2) that there was no substantial evidence to support the verdict and judgment, and (3) that the court erred in denying his motion for summary judgment considered and ruled on before the jury trial, his motion for peremptory instruction at the conclusion of all the evidence, and his motion for judgment notwithstanding the verdict made after the trial. He also assigns error in respect to certain instructions to the jury.[1]

Statement.

The question as to the sufficiency of the evidence to sustain the verdict for the defendant has compelled study of all the evidence, and we find that there was substantial evidence to show that: In the year 1940 Curtiss had employed an advertising agency to assist in arranging for and carrying on the various advertising projects

---

[1] A further contention that Curtiss had no right to plead its several defenses in its amended answer to Owens's amended petition appears to us to be without merit.

by which Curtiss promoted the sale of its candy bars, and Owens's claim to having a two year employment contract with Curtiss was based entirely on dealings and correspondence with the agency. He had no conversations or correspondence directly with Curtiss. A Mr. Tuteur was Chicago manager of the agency, and in the winter of 1939-1940 Owens called on Tuteur at his office in Chicago and following conversations concerning the possibility of Owens obtaining employment by Curtiss, Owens submitted written proposals in letters dated February 15 and 23, 1940, in which he proposed to present a series of radio broadcasts under Curtiss' sponsorship. Curtiss was to pay the costs of the radio time and facilities and Owens was to be paid $414.00 per week during a proposed thirteen week test period. After that period, if Curtiss decided to employ Owens to present his performance over a radio network Owens would charge $500 per week. In the second letter of February 23, Owens, after repeating the proposal for a thirteen week test period consisting of a radio broadcast program originating in St. Louis, Missouri, gave Curtiss an option to continue his services on a network for $500 per week net. The wording was:

"I realize and understand that following the test period it would not be good business for Curtiss Candy Co. to continue on a network during the summer months. However, if Curtiss Candy Co. desires to continue with my services on the network in the fall and they will give me notice of their intention after ten weeks on the test, they shall have the right for a period of two years from date of first network broadcast to my exclusive radio services for a cost of $500 per week net. This includes my services on radio broadcasting, my scripts, and personal appearances.

"If the Curtiss Candy Co. takes up this option within the first ten weeks of the test period, they can at their option set the time for the starting of the network broadcasts if they start by the last week in September, 1940.

"I however would reserve the right to make motion pictures during my layoff months."

These letters were kept on file in the agency, but it does not appear that any reference was ever made in writing by or for Curtiss to either of them. An arrangement for the employment of Owens during a test period was made orally and Owens began his broadcasts from St. Louis in April, 1940. The main interest of Curtiss in the venture was whether an increase in sales commensurate with the cost would result. Owens strove diligently to please and increase his audience and to "plug" for Curtiss. The advertising agency was not paid a wage by either Curtiss or Owens but received from Curtiss in compensation for its work a percentage of the cost of the venture to Curtiss. Acting through its Mr. Tuteur, its effort was to sell Owens's radio show to Curtiss on the basis of a commission to itself for bringing and holding Curtiss, the radio companies and Owens together for mutual profit. Curtiss admitted for the purposes of the suit that Tuteur was its agent in respect to all the transactions in controversy in this suit and Owens had one Kenyon Bennett acting throughout the period as his agent.

As the test period proceeded Tuteur, Owens and Bennett were all anxious about the continuation of the Curtiss sponsorship and there were numerous letters and phone calls between them relating to that subject, all three having the same interest in inducing Curtiss to continue its sponsorship of the Owens radio performances. But on June 14, 1940 (about two weeks before the end of the test period) Tuteur wrote Bennett advising that Curtiss had decided to go off the air at the conclusion of the test period.

Further correspondence followed concerning details of the discontinuance of the program and Owens and Bennett submitted new proposals and plans to Tuteur for submission to Curtiss in an effort to induce Curtiss to reconsider its decision and to continue the employment to some extent and in some manner. On June 23, 1940, Bennett wrote Tuteur a letter along that line proposing a plan for performances by Owens on a small network over designated radio stations covering several of the Midwestern states which

"would permit 'Buck' to make personal appearances throughout the entire area covered by the five stations" and setting forth an itemized statement of the cost of the plan and of the radio hours to be used. There was no reference in the letter to the proposals for employment which Owens had made in his letters of February 1940 nor as to the time for which the new proposed employment was to run except the letter stated: "These figures are the regular per week cost, based on a thirteen week schedule."

Mr. Tuteur took this letter to Mr. Schnering, president of Curtiss, and on the basis of the costs and radio times set up in it Mr. Schnering decided to accept the proposal contained in it and also to continue Owens's services during the summer period on a weekly basis of $300 per week. Tuteur telephoned this information to Owens and on June 26, 1940, wrote Owens:

"I know you were delighted to learn that Mr. Schnering of the Curtiss Candy Company has decided to continue both your program and your personal appearances. * * * He has planned as soon as possible to use the hook up which Bennett outlined to me in his letter of Sunday June 23."

This is the only writing in the record signed by Curtiss or its agent accepting *any* offer or proposition submitted by or for Owens.

The record shows that after Tuteur had submitted the letter to Curtiss and obtained approval of the proposal contained in it, he immediately conferred with local representatives of the radio networks and was informed by them that an error had been made and that the radio time specified in the letter would not be available and that the quotations of network time costs were too low. Tuteur accordingly telegraphed Bennett to meet him and one Campbell, representative of KMOX radio station in St. Louis the next day, stating "Necessary we straighten out rates you have quoted on five station hook up." The meeting was attended by Tuteur, Bennett and two representatives of the radio companies and the matter was gone into with the figures of Bennett's letter before them. The radio

station representatives were endeavoring to obtain a contract from Curtiss through Tuteur and had considered the plan of the letter of June 23d and accordingly presented accurate figures in a written summary of the cost and available time for such a program as was proposed in the letter, and a copy of the summary was given to Mr. Bennett. It clearly showed that Bennett's cost figures were too low and that the radio hours he had specified were not available.

Thereupon Tuteur stated to Bennett that these rates, the time availabilities and the whole proposition was not in accord with his letter of June 23d. "I told him that these rates, the time availabilities and the whole proposition was not in accordance with his letter of June 23d. I told him that the price differential was so great that I could not approve any proposition such as is on these memorandums. I told him also that this puts an entirely different complexion on the possibility of our continuing on the air, that I would have to return to Chicago, see Mr. Schnering, explain the discrepancies in money, in time availabilities, in a change in the entire nature of what had been suggested by Mr. Bennett; that I would have to get a considerable amount in additional funds before we could proceed; that in view of that fact I was not at all sure that we would be able to proceed, but that I would do my best with Mr. Schnering to try to talk him into one of these alternative propositions.

"Q. What did Mr. Bennett say to that? A. He entirely agreed that there was nothing else that could be done."

Although Owens was not present at the meeting, being represented by Bennett, Mr. Tuteur saw Owens during the day, told him of the inaccuracy of Bennett's representations on which Curtiss had based its acceptance and that he (Tuteur) "was very skeptical as to what the outcome of future negotiations with Mr. Schnering would be," in reply to which Owens "expressed the hope that I (Tuteur) would be able to sell Mr. Schnering on the increased appropriation necessary."

Owens made no objection to Tuteur's renewing negotiations with Curtiss on the

basis of abandoning the approval of the proposal of the June 23d letter and endeavoring to reach a new agreement, and Owens made no claim that Curtiss was obligated to employ him for a two year period by reason of anything said or done prior to the St. Louis meeting. The record is clear that no such claim was ever asserted throughout the period of constant correspondence and communication preceding the termination of all relations between the parties in August, 1940.

On Tuteur's return to Chicago he had further discussions with Curtiss and his correspondence with Owens and Bennett continued. On July 3, 1940, he wrote Bennett and among other things stated that credit inquiries concerning Owens had been received by Curtiss and that "frankly both Curtiss and myself have had to inform all parties making inquiry that we have only known you folks for approximately six months, that all of our relations with you have been pleasant and satisfactory in every respect, that our future relations are still on the week to week basis with the hope that your services will be continued."

The correspondence between Tuteur and Owens and Bennett after the St. Louis meeting presents substantial evidence that Owens understood that the Curtiss approval of the proposal of the letter of June 23, 1940, had been revoked and Curtiss' decision to proceed thereunder had been withdrawn and that Owens acquiesced and endeavored by submitting different proposals to induce Curtiss to enter into some other contract.

On July 22, 1940, Tuteur wrote Owens to the effect that there was no possibility of a reconsideration by Curtiss of its decision not to go on with the radio network. He said: "As I explained to you in St. Louis, Mr. Schnering had approved the set-up outlined in Bennett's letter of June 23d, which provided for three one-quarter hour periods per week over a certain set-up. However, as I further explained to you, when this set-up could not be obtained for several reasons, which Bennett is not at all

responsible for, I informed you that it would throw the whole subject up for considerable further discussion and I had misgivings as to the possibility of getting it reapproved on the new basis. This is exactly what has happened, so I'm sure you fully understand the circumstances."

The efforts to negotiate a contract culminated in a letter of August 5, 1940, from Tuteur to Owens definitely stating that Curtiss would discontinue Owens's work as of August 10, 1940, followed by a letter from Owens to Tuteur on August 8, 1940, in which Owens indicated his understanding that his employment by Curtiss had ended. He said, "Later on I will come in to Chicago and maybe we can sell Curtiss on the recording idea.[2] * * * It has been a pleasure for me to work for you and I want you to know that I appreciate your untiring efforts in selling my show and your wonderful cooperation. I will keep you posted from time to time as to what I am doing, and remember, if you happen to run into another account that might buy my show, I am always at your service. * * * Any time you want me just let me know." On August 19, 1940, Bennett wrote a letter to Tuteur outlining another new plan which was not accepted, and there were no further transactions or relations between the parties until Owens brought this suit.

### Opinion

It appeared to the trial court that although there was no document signed by Curtiss or its agent agreeing to employ Owens for a two year period, that such an agreement could be spelled out from the letters which passed between Owens, his agent Bennett and Tuteur during the period between February and August 1940, and particularly that upon consideration of the whole correspondence, Tuteur's letter of June 26th answering Bennett's letter of June 23d constituted acceptance of Owens's proposal for two years of employment. The case was accordingly submitted to the jury on the basis that it had been established as a matter of law that prior to the meeting of the parties in St. Louis on June 28, 1940,

---

[2] This plan contemplated that instead of Owens making constant appearances on the radio there would be a recording of performances made which would be repeated without Owens's presence. It was never acted upon.

there was a binding two year contract of employment at $500 per week. The court submitted to the jury only the issues whether Curtiss had been induced to contract by misrepresentations of radio time available and the cost thereof in the letter of June 23d, 1940, and whether upon discovery at that meeting of the radio time actually available and its actual cost there was a rescission of the contract by Curtiss and acquiescence therein by Owens so that the contract was mutually rescinded and whether Owens by his conduct, acts and statements abandoned his contractual right. The verdict of the jury is therefore a finding that the letter of June 23d did incorrectly state the radio time available for the proposed Owens performances and the cost thereof and that the statements were material and relied on by Curtiss and that upon discovery of the true facts the existence of a contract for future employment of Owens by Curtiss was terminated by the parties.

The facts we have outlined, which were shown by substantial evidence in the record, were clearly sufficient to justify inference by the jury that Curtiss had been led to decide that Owens should give his performances on the radio under Curtiss sponsorship by the representations concerning the costs and hours of the performances contained in the letter proposing the performances; that the representations were incorrect and that when the parties discovered the mistake they abandoned any agreement up to that point and commenced new negotiations from which no contract resulted. The verdict therefore is supported by the evidence.

■ *Instructions.* Owens excepted to the part of the court's charge submitting the question of the correctness of the "figures" of the costs and hours of the Owens performances contained in the June 23d letter proposing the performances. The letter was written by Bennett and it is contended for Owens that although Bennett was his agent generally throughout the transactions in the case, the agency did not extend to the quoting of costs or radio times of the Owens performances and that Owens was not bound by Bennett's representations concerning those matters. But the evidence was that the only written proposal by Owens to Curtiss to enter into a contract ever accepted in writing on behalf of Curtiss was the proposal of Bennett's letter of June 23d and the trial court was right in informing the jury that as Owens sought to recover on the basis of that written proposal and the written acceptance of it, he was bound by the statements which were an integral part of the proposal and which induced its acceptance.

■ Owens also complains that the trial court failed to inform the jury that in order to justify rescission of a contract for misrepresentation of facts inducing its execution the proof must amount to more than a mere preponderance of evidence. But no exception was taken to the court's instructions in respect to the burden of proof in the case, nor was request made for specific instruction. The instructions as a whole fairly submitted the issues remaining for decision on the basis of the court's conclusion that an actionable contract in writing had been proven. There was no error prejudicial to Owens in the trial of those issues and the verdict upon them against him was supported by the evidence.

■ It is contended for the appellee Curtiss that the judgment in its favor should be sustained on the further ground that Owens suing on an alleged contract not to be performed within one year did not make out a case within the statute of frauds in that he did not show an agreement by Curtiss (the party to be charged) to the essential terms of the contract by writing or writings. The contention was pressed upon the trial court in pleadings, objections to evidence and motions, and if well taken required a judgment against Owens. He objects to our consideration of the contention because Curtiss has not filed cross appeal in this court. But "the contention seeks only to sustain the judgment for a reason presented at the trial and determined adversely to appellee" and as this court announced in Standard Acc. Insurance Co. v. Roberts, 8 Cir., 132 F.2d 794, loc.cit. 796, "In such situations the rule is that 'a respondent or appellee may urge any matter

appearing in the record in support of a judgment,'" citing the cases. Accordingly we have searched the record for evidence in writing of the contract of employment for two years asserted and sued on by Owens. His theory is that it may be spelled out of the letters written by himself, Bennett and Tuteur during the period February to June, 1940, in that the writings may be found to contain a proposal by Owens and his agent Bennett to enter into such contract and acceptance by Curtiss through its agent Tuteur. We find that the only reference to a two years employment in the entire voluminous correspondence is made in Owens's letter to Tuteur dated February 23d from which we have quoted. There Owens, after expressing his willingness to work for Curtiss for a two year period said that "if the Curtiss Candy Co. takes up this option * * * they can at their option set the time for the starting * * *." The letter as stated was kept in the file of the agency and we do not find throughout the subsequent correspondence any single reference either general or specific, to the "option" there set forth. Although Owens worked for Curtiss beyond the period called the test period, the amounts which became due him for the work were not disputed and were paid and the payments accepted in accordance with mutual understandings arrived at between the parties without regard to Owens's February letters. The letter of June 23d which we have quoted from and discussed, the reply to which is mainly relied on by Owens as constituting an acceptance, says nothing about the two year proposal or option in the February letter and it contains no statement or reference to reflect any connection between it and the letter of February. On the contrary, it is manifest from the record that the letter of June 23d

was submitted for Owens as a new and distinct proposal to be conveyed to Curtiss to induce Curtiss to reconsider its announced termination of relations and to induce it to hire Owens to perform the particular services outlined in that letter. There is no letter signed by Tuteur accepting a proposal from Owens for a two year employment and neither can an acceptance of such a proposal be gathered from the whole of the correspondence. There is no substantial evidence to be found in the whole record that Curtiss or its agent Tuteur ever intended to employ Owens for a two year period. It is well settled that a complete contract binding under the statute of frauds may be gathered from letters, writings, telegrams and memoranda so connected with each other that they may be fairly said to constitute one paper relating to the contract though only one of the writings may be signed by the party to be charged. But in order to charge Curtiss on a two year contract of employment entered into by written proposal signed by Owens and written acceptance thereof by or for Curtiss, it was necessary for Owens to show that the paper Curtiss signed in clear and distinct terms referred to a proposal by Owens of such contract which Curtiss did not sign itself or by its agent. The record here is clear that Tuteur, the agent for Curtiss, did not sign any writing in which he accepted a proposal by Owens to work for Curtiss for two years. He signed nothing in which he referred to such a proposal, either in clear or distinct terms or otherwise. Accordingly there was no proof of a written contract actionable under the statute of frauds of Illinois or Missouri and the judgment dismissing the case was the only judgment which could rightly be entered on the evidence.

Affirmed.